# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| In re: | Chapter 7 |
| **Mack Industries, Ltd.**, *et al.*, | Bankruptcy No. 17-09308 (Jointly Administered) |
| Debtors.[1] | Honorable Carol A. Doyle |
| **Ronald R. Peterson**, as chapter 7 trustee for Mack Industries Ltd., | |
| Plaintiff, | |
| v. | Adversary No. 19-00578 |
| **Advanced Home Remodeling Inc.**, | |
| Defendant. | |

## AMENDED COMPLAINT

1.   Mack Industries Ltd. (the "Debtor") transferred $16,504,649.79 to Advanced Home Remodeling Inc. ("Advanced") not for its own benefit, but for the benefit of other entities. The Debtor got no value for the transfers, which it made while insolvent and as part of a scheme to hinder, delay, and defraud its creditors, including American Residential Leasing Company LLC. Therefore, Ronald R. Peterson, as chapter 7 trustee for the Debtor, (the "Trustee") seeks to avoid and recover those transfers for the estate's benefit.

---

[1] The Debtors, with their respective bankruptcy case numbers, are as follows: Mack Industries, Ltd. (17-09308); Oak Park Avenue Realty, Ltd. (17-16651); Mack Industries II, LLC (17-16859); Mack Industries III, LLC (17-17106); Mack Industries IV, LLC (17-17109); Mack Industries V, LLC (18-03445); and Mack Industries VI, LLC (18-03451).

{00161571}

## JURISDICTION AND VENUE

2. This adversary proceeding arises in the chapter 7 bankruptcy case of Mack Industries Ltd., pending before this Court as case number 17-09308.

3. Pursuant to 28 U.S.C. § 1334(b), this Court has subject matter jurisdiction over this proceeding, which is referred here pursuant to 28 U.S.C. § 157(b) and Local Rule 40.3.1(a) of the United States District Court for the Northern District of Illinois.

4. This is a core proceeding under 28 U.S.C. § 157(b)(2)(F) and (H), and this Court has constitutional authority to enter final judgments and orders herein. If a court determines that any portion of this proceeding is not a core proceeding or that a bankruptcy judge does not have constitutional authority to enter final judgments in this proceeding, the Trustee consents, pursuant to 28 U.S.C. § 157(c), to a bankruptcy judge hearing and finally determining the proceeding and entering appropriate orders and judgments.

5. This Court is the proper venue for this adversary proceeding pursuant to 28 U.S.C. §§ 1408 and 1409.

## GENERAL ALLEGATIONS

**1. The McClelland family entities.**

6. The Debtor was created in 1998 and was owned by James K. McClelland.

7. James K. McClelland and his son James H. McClelland managed the Debtor.

8. One of the Debtor's main lines of business was flipping houses: the Debtor would acquire real estate, rehab it, and then sell it or rent it to generate income.

9. Prior to 2013, the McClellands operated the real estate business in the Debtor's name, except for certain lines of business or opportunities they pursued in the names of Mack Investments I LLC, an entity owned by James K. McClelland and created in 2009; 2300-16 S. Central LLC, an entity owned by James H.

McClelland and created in 2011; and Mack Property Group Ltd., an entity created in 2009.

10. In 2013, however, the McClelland family began to create new entities owned directly or indirectly by the McClelland family.

11. The McClelland family entities included Mack Industries II LLC, Mack Industries III LLC, Mack Industries V LLC, Mack Investments I LLC, Mack Investments II LLC, Wheelhouse Investments LLC, Mack LOC I LLC, and Mack LOC II LLC.

12. The Debtor and the McClelland family entities engaged in the business of wholesale real estate investing, management, and development.

## 2. Advanced's relationship to the McClelland family entities.

13. Advanced was created in January 2013.

14. Advanced is in the business of renovating properties that others owned.

15. Advanced's president is Michael Marion.

16. Marion was a close associate of the McClelland family entities.

17. Marion often used an "ibuymack.com" email address when conducting Advanced's business.

18. On Advanced's page on the Illinois Secretary of State's website, two addresses are listed for Marion. One is 13121 Steeplechase Dr., New Lenox, IL 60451, a property that Marion acquired from Investments I in October 2015. The other is 17669 Peacock Lane, Tinley Park, IL 60487, which, prior to the Debtor's bankruptcy, was owned at various times by Mack Investments I LLC, the Debtor, and Mack Industries VI LLC.

19. Advanced provided services to improve real estate owned by the Debtor, by the McClelland family entities, and others.

20. As described in detail in this complaint, the Debtor paid Advanced to improve real estate that the Debtor did not own as part of a scheme to dissipate its assets to hinder, delay, and defraud American Residential Leasing Company LLC and to benefit the McClellands and their other entities.

{00161571}  —3—

### 3. The relationship between the Debtor and American Residential.

21. One line of business that the Debtor pursued was managing properties owned by American Residential Leasing Company LLC.

22. In December 2012, the Debtor entered into a Master Lease Agreement with American Residential.

23. Under the Agreement, the Debtor leased several hundred residential properties from American Residential.

24. Between December 2012 and January 2014, Mack and American Residential amended their Agreement 20 times to add additional properties.

25. Under the Agreement, the Debtor was to sublease the American Residential properties to residential tenants, and the Debtor was obligated to maintain the properties, to pay American Residential certain rental and other fees each month, and to pay all property taxes levied against the properties.

26. Under the Agreement, the Debtor was obligated to pay American Residential monthly rents calculated from an annual base rent (the "Base Monthly Rental") and quarterly rents based on a percentage of the Debtor's annual gross revenues (the "Quarterly Percentage Rental").

27. In January 2014, the Base Monthly Rental was $405,878.13.

28. The Base Monthly Rental increased by up to 3% annually, so it increased to $418,054.49 in February 2014, $430,596.11 in January 2015, and $444,514.00 in January 2016.

29. The Quarterly Percentage Rental amounts were estimated quarterly based on written statements (the "Quarterly Statements") that the Debtor was supposed to provide to American Residential, setting forth the Debtor's revenues for the previous quarter.

30. At the end of each year, the Debtor was also required to provide a written statement setting forth its actual gross revenue for the prior year and to pay any deficiency in the Quarterly Percentage Rental amounts actually paid during the prior year.

### 4. The Debtor threatens to dissipate assets if American Residential does not renegotiate the parties' contract.

31. Beginning in summer 2014, the Debtor claimed that it was incapable of meeting its obligations under the Agreement and requested that the Agreement be modified to reduce those obligations. One of the Debtor's primary negotiators was Eric Workman, the Debtor's Vice President of Sales and Marketing.

32. On July 8, 2014, Workman sent an email to Christopher J. Byce (formerly Senior Vice President, Investments, of American Residential's prior parent company) stating that "the overall economics of the Mack–ARP relationship … is not performing at a profitability level that is sustainable to Mack."

33. Later, on December 5, 2014, James H. McClelland, a Debtor representative and the son of the Debtor's owner, submitted a proposal to modify the Agreement via letter to Byce representing that "any substantial changes in the [proposed] terms will be untenable insofar as Mack's ability to perform under a revised agreement. Mack has exhausted all avenues to borrow the money to pay the back taxes, as the time frame and usage of funds makes this type of loan next to impossible for it to acquire."

34. In connection with the Debtor's request to modify the Agreement, its representatives made several statements revealing the Debtor's intent to engage in fraudulent conduct if American Residential did not agree to the Debtor's proposed terms.

35. Specifically, in June 2014, Workman told Byce that, absent a modification, the Debtor would transfer its assets to related entities for nothing in return to hinder American Residential's ability to exercise its legal remedies as a creditor or otherwise.

36. During the negotiations with American Residential, Workman also told Byce that the Debtor's special relationships with local authorities in Cook County and surrounding areas would prevent American Residential from exercising management and control over its properties.

37. American Residential and the Debtor were not able to agree on a modification to the Agreement.

38. The relationship between American Residential and the Debtor continued to deteriorate during the negotiations and after the negotiations failed.

39. By September 2014, the Debtor stopped making the full Base Monthly Rental Payments, and it made no payments at all in eight months between September 2014 and February 2016. American Residential calculates that the Debtor owes more than $4.7 million for unpaid rent.

40. In 2014, the Debtor stopped paying property taxes on American Residential's properties for the years 2013 and forward. American Residential calculates that the Debtor owes more than $6.5 million for these taxes.

41. American Residential sent the Debtor a Notice of Default on December 2, 2014.

42. Eventually, on March 21, 2016, American Residential filed a complaint against the Debtor and others in Illinois state court.

## 5. The parties do not agree on a modification to the Agreement, so the Debtor dissipates its assets.

43. American Residential and the Debtor were not able to agree on a modification to the Agreement.

44. Even before making its threats to American Residential, the Debtor began preparing for a possible breakdown in the business relationship.

45. In the months leading up to and during the negotiations with American Residential, the Debtor had already begun dissipating its assets. True to its threat to American Residential, the Debtor continued that dissipation when the negotiations failed.

46. Prior to 2013, the McClellands ran almost the entire real estate business in the Debtor's name.

47. In 2013, however, the McClelland family began to create new entities and to divert business opportunities and assets from the Debtor to those entities.

48. In 2013, the McClellands created at least 15 new entities. In 2014, they created at least four; in 2015, at least six; and in 2016, at least two.

49. The Debtor owned five of these new entities: Mack Industries II LLC, Mack Industries III LLC, Mack Industries IV LLC, Mack Industries V LLC, and Mack Industries VI LLC.

50. The remaining new entities were owned by James K. McClelland, James H. McClelland, or both.

51. The McClellands used these new entities to pursue business opportunities that the Debtor would have pursued in the past.

52. Although the Debtor still owned some real estate after 2013, the vast majority of real estate acquired for flipping was acquired by the new entities. In addition, the Debtor transferred real estate from itself to these new entities.

53. By acquiring real estate and other assets in the name of the new entities and transferring real estate from the Debtor to the new entities, the McClelland family reduced the assets that the Debtor had that could be collected by American Residential.

54. Compounding the situation, the Debtor drew down on its own assets to benefit these other entities.

55. The Debtor paid contractors to work on and improve the real estate owned by the other entities. It bought supplies that would be used only to improve real estate owned by the other entities. It paid bank loans incurred by the other entities. It paid for other services, such as lawyers or tax advisors, to benefit the other entities.

56. The Debtor did not get any value for making these payments. Instead, the parties that benefitted were the other entities and, ultimately, the McClellands.

57. From 2013 to 2017—the period in which the Debtor claimed that it could not pay American Residential what it owed under the Agreement—the McClelland family extracted at least $10.7 million in cash from the Debtor and the other entities.

58. By spending its own money and getting nothing in return, the Debtor further dissipated its assets, further hindering, delaying, and defrauding American Residential while the McClellands benefitted.

59. The Debtor also concealed its dissipation from American Residential.

60. The Debtor was supposed to provide American Residential with Quarterly Statements detailing its income, but the Debtor stopped providing those reports after June 2014.

61. In 2016, after the Debtor defaulted on the Agreement, American Residential tried to take over management of its properties.

62. The Debtor, however, prevented American Residential from doing so by refusing to provide subtenant and property information that American Residential requested and was entitled to under the Agreement.

63. The Debtor's efforts to dissipate its assets to hinder, delay, and defraud American Residential continued from 2013 to March 2017, when the Debtor filed for bankruptcy.

64. The Debtor's efforts to render itself insolvent were successful.

65. The Debtor's books and records reflect that, on March 24, 2017, the date it filed for bankruptcy, the Debtor had assets of $56.4 million and liabilities of $71.2 million on a cash basis.

66. The Debtor's books and records reflect that, in the year prior to March 24, 2017, the Debtor had net income of negative $7,270,679.43 on a cash basis.

67. Creditors existed with standing to bring an action against the Debtor to avoid the obligations and transfers described in this complaint under applicable non-bankruptcy law, including American Residential and the Internal Revenue Service. To the extent the IRS is a creditor, the period for avoiding obligations and transfers is at least 10 years.

68. During the course of this proceeding, the Trustee may learn (through discovery or otherwise) of additional obligations or transfers made to or for the benefit of Advanced during the period for which obligations or transfers can be

avoided. It is the Trustee's intention to avoid and recover all obligations and transfers the Debtor made that are avoidable under 11 U.S.C. §§ 544 and 548. The Trustee reserves his right to amend his complaint to include: (i) further information regarding the obligations and transfers; (ii) additional obligations and transfers; (iii) modifications of and/or revisions to any defendant's name; (iv) additional defendants; and/or (v) additional causes of action or legal theories, if applicable, (collectively, the "Amendments") that may become known to the Trustee at any time during this adversary proceeding, through formal discovery or otherwise, and for the Amendments to relate back to the date of the original complaint.

## COUNT 1 – AVOIDANCE AND RECOVERY OF CONSTRUCTIVE FRAUDULENT TRANSFERS
### 740 ILCS 160/5(a)(2), 6(a), and 8(a), and 11 U.S.C. §§ 544(b)(1), 548(a)(1)(B), and 550(a)

69. The Trustee incorporates the previous allegations of this complaint as though fully set forth in this count.

70. The Trustee pleads this count in the alternative to the extent the relief or the allegations contradict anything else contained in this complaint.

**1. The Debtor pays Advanced to improve real estate owned by other entities.**

71. Between March 10, 2013, and January 3, 2017, Advanced issued invoices to the Debtor for services to improve parcels of real estate that the Debtor did not own, and the Debtor paid those invoices.

72. As a general rule, each transaction was for a specific parcel, and the parcel's address was specifically identified on Advanced's invoice, in the Debtor's books and records, and on related documents.

73. After Advanced supplied the services, the Debtor paid Advanced's invoices for the services.

74. A list of each transfer that the Debtor made to Advanced is attached as Exhibit A.

75. Each transfer was in payment of one or more invoices that Advanced submitted to the Debtor.

76. In some cases, the Debtor would transfer the entire amount of an invoice to Advanced. In other cases, the Debtor would transfer only a portion of the invoice, transferring additional portions later as the project at issue progressed to completion.

77. A list of the invoices paid by the Debtor's transfers, broken down to show the property at issue and the property's owner for each portion of the invoice, is attached as Exhibit B.

78. The "Owner" column on Exhibit B identifies the owner of the real estate on the invoice date for each property.

79. The owner of the beneficial interest in Chicago Title Land Trust dated Mar. 14, 2013, No. 8002361345 is Mack Industries II LLC.

80. The owner of the beneficial interest in Chicago Title Land Trust dated Apr. 9, 2013, No. 8002361677 is Mack Industries III LLC.

81. The owner of the beneficial interest in Chicago Title Land Trust dated Oct. 25, 2016, No. 8002372790 is Mack Industries II LLC.

82. There are two types of transfers on Exhibit A: bill payments and checks. There are two types of invoices on Exhibit B: bills and check payments. (There are also credits noted on Exhibit B). At times, the Debtor would enter an invoice as a bill in its bookkeeping software, and the later transfer to pay that invoice would be booked as a bill payment. Other times, the Debtor would not enter an invoice as a bill, so the later transfer would be booked as a check, and the invoices paid are noted as check payments in Exhibit B.

83. As detailed on Exhibit A, the Debtor made 201 transfers on account of 9,526 invoices totaling $16,504,649.79 on account of properties that the Debtor did not own. This is 95% of Advanced's invoices that the Debtor paid during the time period at issue in this complaint.

84. The last seven transfers that the Debtor made to Advanced were particularly egregious. Between October 7, 2016, and January 3, 2017, the Debtor made seven payments of exactly $30,000 each. The transfers were not on account of any invoice for contractor services, and the Debtor had never before made transfers to Advanced in large, round numbers like this.

85. Instead, the Debtor described the transfers were "loan advances" in its books and records, advanced on account of a note receivable owed by James H. McClelland, the son of the Debtor's owner and a manager of the Debtor. The $210,000 was transferred to further deplete the Debtor's assets and to benefit the McClelland family.

### 2. The Debtor did not receive reasonably equivalent value in exchange for paying Advanced.

86. The invoices and payments at issue in this complaint were for parcels of real estate that the Debtor did not own.

87. Instead, the real estate that Advanced improved was owned by Mack Industries II LLC, Mack Industries III LLC, Mack Industries V LLC, Mack Investments I LLC, Mack Investments II LLC, Wheelhouse Investments LLC, Mack LOC I LLC, Mack LOC II LLC, and others.

88. Because the Debtor did not own the real estate that Advanced improved, the Debtor did not benefit at all from Advanced's services.

89. By incurring each obligation to Advanced and paying the resulting invoice, the Debtor transferred away assets and got no benefit in return.

90. Therefore, the Debtor did not receive a reasonably equivalent value for the transfers and obligations detailed in this complaint.

### 3. The Debtor was insolvent at the time it incurred the obligations and made the transfers to Advanced.

91. The obligations and transfers at issue in this complaint occurred between March 10, 2013, and January 3, 2017.

92. The Debtor's books and records reflect that, on July 31, 2014, Mack's liabilities exceeded its assets by $2,016,009.01.

93. The Debtor's liabilities exceeded its assets on each date after July 31, 2014, until it filed for bankruptcy on March 24, 2017.

94. The Debtor's books and records reflect that, on March 24, 2017, the Debtor's liabilities exceeded its assets by $14,794,001.84.

95. The Debtor's books and records reflect that, each month between March 2013 and July 2014, Mack's assets exceeded its liabilities by an average of just $1,527,932.57. During that period, the Debtor's assets each month averaged just $30,141,277.82, while its liabilities each month averaged $28,613,345.25.

96. The Debtor's earnings decreased significantly between March 2013 and July 2014, further demonstrating its fragile financial position. The Debtor's average monthly net income for 2013 was $236,456.86, but for 2014 it was negative $528,550.83.

97. Because the Debtor was losing money so rapidly, it was not generating sufficient profits to sustain its operations, particularly because its equity was only about 5% of the value of its assets.

98. In fact, because the Debtor was losing money, by July 31, 2014, the Debtor was balance sheet insolvent and remained so until it filed for bankruptcy.

99. During the time period at issue in this complaint—that is, between March 10, 2013, and March 24, 2017—Mack's net income was negative $19,226,160.72.

100. During the time period at issue in this complaint, the Debtor was incurring debts and was not paying those debts as they became due.

101. The Debtor's accounts payable had the following ages on the following dates:

| Date | Current | 1-30 days | 31-60 days | 61-90 days | >90 | Total |
|---|---|---|---|---|---|---|
| 3/24/17 | $88.95 | $33,430.70 | $104,680.13 | $130,236.00 | $1,095,240.77 | $1,363,676.55 |
| 3/24/16 | 24,381.64 | 698,503.00 | 135,109.83 | 488,291.47 | 486,178.82 | 1,832,464.76 |
| 3/24/15 | 14,860.23 | 875,471.28 | 16,842.69 | 12,352.79 | 151,191.69 | 1,070,718.68 |
| 3/24/14 | 60,911.57 | 496,109.35 | 137,838.42 | 90,254.86 | 38,243.01 | 823,357.21 |
| 3/24/13 | 15,141.03 | 911,193.57 | 308,858.07 | 14,481.28 | 19,697.12 | 1,269,471.07 |

**Wherefore**, the Trustee requests that this Court enter judgment in his favor and against Advanced (a) avoiding the transfers, (b) entering a money judgment against Advanced in the amount of $16,504,649.79 or such higher amount as may be established at trial, plus interest from the date of each transfer at the maximum legal rate, costs, and expenses of this action including, without limitation, attorneys' fees, and (c) granting any additional relief that is appropriate under the circumstances.

## COUNT 2 – AVOIDANCE AND RECOVERY OF ACTUAL FRAUDULENT TRANSFERS
## 740 ILCS 160/5(a)(1) and 8(a)
## and 11 U.S.C. §§ 544(b)(1), 548(a)(1)(A), and 550(a)

102. The Trustee incorporates the previous allegations of this complaint as though fully set forth in this count.

103. The Trustee pleads this count in the alternative to the extent the relief or the allegations contradict anything else contained in this complaint.

104. As described above, the Debtor engaged in a scheme to hinder, delay, and defraud American Residential by transferring away its assets, reducing what American Residential could collect and improving the position of the McClellands and their other entities.

105. As part of its scheme to hinder, delay, and defraud American Residential, the Debtor paid Advanced $16,504,649.79 to improve real estate owned by Mack Industries II LLC, Mack Industries III LLC, Mack Industries V LLC, Mack Investments I LLC, Mack Investments II LLC, Wheelhouse Investments LLC, Mack LOC I LLC, Mack LOC II LLC, and others, as described in detail above.

106. Each obligation incurred and payment to Advanced reduced the Debtor's assets, leaving less for American Residential to collect.

107. Each obligation incurred and transfer to Advanced improved real estate owned by other entities, benefitting the McClelland family at the expense of American Residential.

108. The Debtor did not disclose the transactions with Advanced to American Residential. The Debtor stopped providing the required disclosures to American Residential in June 2014.

109. The Debtor incurred the obligations and made the transfers between March 2013 and January 2017. American Residential issued a notice of default in December 2014 and sued the Debtor on March 21, 2016.

110. As described in detail above, the Debtor did not get any value for incurring the obligations or making the payments to Advanced because it did not own the real estate that Advanced improved.

111. As described in detail above, the Debtor was insolvent at the time it incurred the obligations and made the transfers to Advanced.

**Wherefore**, the Trustee requests that this Court enter judgment in his favor and against Advanced (a) avoiding the transfers, (b) entering a money judgment against Advanced in the amount of $16,504,649.79 or such higher amount as may be established at trial, plus interest from the date of each transfer at the maximum legal rate, costs, and expenses of this action including, without limitation, attorneys' fees, and (c) granting any additional relief that is appropriate under the circumstances.

## COUNT 3 – AVOIDANCE AND RECOVERY OF PREFERENCE
## 11 U.S.C. §§ 547 and 550(a)

112. The Trustee incorporates the previous allegations of this complaint as though fully set forth in this count.

113. The Trustee pleads this count in the alternative to the extent the relief or the allegations contradict anything else contained in this complaint.

114. The Debtor filed for bankruptcy on March 24, 2017.

115. On January 3, 2017, Advanced issued a bill to the Debtor for $30,000, describing the invoice as a "loan advance."

116. As described above in Count 1 and in Exhibit A, on January 3, 2017—within 90 days prior to the petition date—the Debtor transferred $30,0000 to Advanced from its account no. 6212 at First Community Financial Bank.

117. The January 3 transfer was on account of the January 3 bill that Advanced issued to the Debtor.

118. To the extent the Debtor was liable for Advanced's January 3 invoice, Advanced was a creditor of the Debtor and the monies owed to it were an antecedent debt.

119. As discussed in detail in Count 1, the Debtor was insolvent on the date of the transfer.

120. As a result of the transfer, Advanced received more than it would have received if: (i) the Debtor's case was under chapter 7 of the Bankruptcy Code; (ii) the transfer had not been made; and (iii) Sherwin received payment of its debt under the provisions of the Bankruptcy Code.

121. As reflected in the Debtor's schedules as filed in the underlying bankruptcy case as well as the proofs of claim that have been filed to date, the Debtor's liabilities exceeded its assets to the point that unsecured creditors will not receive a full payout of their claims from the Debtor's bankruptcy estate.

**Wherefore**, the Trustee requests that this Court enter judgment in his favor and against Advanced (a) avoiding the preferential transfer, (b) entering a money

judgment against Advanced in the amount of $30,000 or such higher amount as may be established at trial, plus interest from the date of each transfer at the maximum legal rate, costs, and expenses of this action including, without limitation, attorneys' fees, and (c) granting any additional relief that is appropriate under the circumstances.

Dated: February 14, 2020

Respectfully submitted,

**Ronald R. Peterson**, as chapter 7 trustee for Mack Industries Ltd.

By: /s/ Jeffrey K. Paulsen
One of His Attorneys

Ariane Holtschlag (6294327)
Jeffrey K. Paulsen (6300528)
**FACTORLAW**
105 W. Madison Street, Suite 1500
Chicago, IL 60602
Tel: (312) 878-0969
Fax: (847) 574-8233
E-mail: aholtschlag@wfactorlaw.com
jpaulsen@wfactorlaw.com

{00161571}   —16—