## UNITED STATES BANKRUPTCY COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| In re:<br><br>**Mack Industries, Ltd.**, *et al.*,<br><br>Debtors.[1] | Chapter 7<br><br>Bankruptcy No. 17-09308<br>(Jointly Administered)<br><br>Honorable Carol A. Doyle |
| **Ronald R. Peterson**, as chapter 7 trustee for Mack Industries Ltd.,<br><br>Plaintiff,<br><br>v.<br><br>**Advanced Home Remodeling Inc.**,<br><br>Defendant. | Adversary No. 19-00578 |

### ADVANCED HOME REMODELING, INC.'S
### RESPONSE TO TRUSTEE'S STATEMENT OF ADDITIONAL FACTS

Defendant, Advanced Home Remodeling Inc. ("Advanced"), by and through its attorneys, Pamela J. Leichtling and Jill Sidorowicz of Noonan & Lieberman, Ltd., submits this response to the Trustee's Statement of Additional Facts as follows.

---

[1] The Debtors, with their respective bankruptcy case numbers, are as follows: Mack Industries, Ltd. (17-09308); Oak Park Avenue Realty, Ltd. (17-16651); Mack Industries II, LLC (17-16859); Mack Industries III, LLC (17-17106); Mack Industries IV, LLC (17-17109); Mack Industries V, LLC (18-03445); and Mack Industries VI, LLC (18-03451).

1

1.      **The McClellands and their Companies.**

1.      Mack Industries Ltd. was created in 1998 and was owned by James K. McClelland.

McClelland Aff. (Trustee's Ex. 5), ¶ 2 & ex. A.

**RESPONSE:** **Defendant admits that James K. McClelland formed Mack Industries Ltd.
("MIL") but denies that Trustee's Ex. 5, ¶ 2 states that James K. McClelland
owned MIL.  Further, as a member of MIL, James K. McClelland owned a
membership interest in MIL only, not the property owned by MIL. See, 805
ILCS 180/30-1.**

2.      James K. McClelland and his son James H. McClelland managed Mack Industries

Ltd. *Id.*  ¶¶ 4-5; McClelland Dep. vol. 1 (Trustee's Ex. 2), 70:4-72:8, Nov. 15, 2021.

**RESPONSE:** **Defendant denies that Trustee's Ex. 2, ¶¶ 4-5 states that James K. McClelland
managed MIL because "manage" implies active role and James H.
McClelland's affidavit states that his dad, James K., took a passive role.  James
K. was a figurehead and not doing day to day management. See Trustee's Ex.
2, 72:1-5.  Defendant admits the statement as to James H. McClelland.**

3.      One of the McClellands' main lines of business was flipping houses: they would

acquire real estate, rehab it, and then sell it or rent it to generate income.  Trustee's Ex. 2, 82:14-

83:20.

**RESPONSE:** **Defendant denies because the Trustee's statement is inaccurate. It was not
"McClelland's" main line of business, but rather MIL's original purpose was
to do fix and flips, as James Jr. testified. See, Trustee's Ex. 2, 82:1-15.**

4.      Mack Industries Ltd. did business as "Mack Companies."  Corporation File Detail

Report (Trustee's Ex. 21).

**RESPONSE:** **Defendants admit MIL did business as "Mack Companies"  and further states
that all of the Mack companies, MIL, Oak Park Realty, Ltd., Mack Loc LLC,
and series LLC companies, Mack Industries, Ltd, series LLC companies,
Mack Services, LLC, Nola Landscape LLC, Mack's affiliates, Mack
Investments LLC and series companies, 2300-16 S. Central, LLC, Lakewood
Partners, LLC, Nola North LLC, Holbrook Partners, LLC, Oak Crest LLC
and Christopher Keen Realty, LLC   did business under the "Mack**

Companies" name (hereinafter referred to as **"Mack Entities."**) (See **Advanced's Ex. B, ¶¶ 2, 9, 11**).

5.      Beginning in 2013, the McClellands began creating many new entities.  Many of these entities existed for lending purposes and operated under one "umbrella."  Trustee's Ex. 2, 88:12-89:5.  These entities included Mac Industries Ltd.'s subsidiaries:  Mack Industries II LLC, Mack Industries III LLC, Mack Industries IV LLC, Mack Industries V LLC, and Mack Industries VI LLC.  Trustee's Ex. 5, ¶ 3 & ex. A.  These entities held real estate as separate collateral portfolios for specific loans from different lenders.  Trustee's Ex. 2, 22:13-18.

**RESPONSE:** **Defendant admits that MIL conducted business for all of the Mack entities, not limited to those specified in statement no. 5, but included all the entities as set forth in James Jr.'s affidavit, as Mack Entities, (See Advanced's Ex. B, ¶¶ 2, 9, 11), under one umbrella, in the name Mack Companies but denies that Trustee's Ex. 5 ¶ 3 supports this fact.  Defendant admits that the purpose for creating these different entities was at the request of the lenders to segregate collateral for loans.**

6.      Other entities, however, were separate- or single-project entities that operated independently.  *Id.* 88:12-89:4; Trustee's Ex. 5, ex. A.  These separate entities mostly were for commercial projects rather than residential flipping.  *E.g.,* Trustee's Ex. 2, 27:3-20.  These separate entities maintained separate books and records.  Trustee's Ex. 5, ¶ 10.

**RESPONSE:** **Defendant fails to identify the purported separate or single project entities in statement no. 6 and as such, Defendant denies same.**

**Defendant also denies that the Mack Entities were treated as separate and independent entities. (Advanced Ex. B, ¶¶ 11, 17-19). James Jr. testified that all the companies were treated as one big company, there was co-mingling of funds among the Mack Entities, intercompany transfers of cash and real estate with no monies exchanged, there were consolidated financials and, in some cases, consolidated tax returns, and the accounting and transfers were the result of treating the Mack Entities as one company and not separate business entities. *Id*. at ¶¶ 17-19.**

7.      The separate- or single-project entities that are relevant to this case are:

    a.   Oak Park Avenue Realty Ltd., which provided brokerage services and manages properties for third parties that bought real estate from the McClellands' entities.  Trustee's Ex. 2, 24:5-25:14.  Oak Park Avenue Realty Ltd. maintained separate books and records in Quickbooks.  Trustee's Ex. 5, ¶ 10.

**RESPONSE:** **Defendant admits that Oak Park Avenue Realty Ltd. provided brokerage services and managed the properties. Defendant admits that Trustee's Ex. 5, ¶ 10, the document states there was a separate QuickBooks file but denies whether Oak Park Avenue Realty Ltd. monies or funds in this file were segregated and not comingled with other Mack Entities. Advanced Ex. B, ¶¶ 11, 17-19). Defendant also incorporates its response to SOF No. 6 denying the Mack companies were separate and independent.**

    b.   2300-16 S. Central LLC, which operated a multi-family building in Cicero, Illinois.  Trustee's Ex. 2, 44:17-45:2.  James H. McClelland owned 2300-16 S. Central LLC.  Trustee's Ex. 5, ex. A.

**RESPONSE:** **Defendant admits that 2300-16 S. Central LLC operated a multifamily building in Cicero, IL.  Defendant denies that James H. McClelland owned 2300-16 S. Central LLC. See, 805 ILCS 180/30-1. Defendant also incorporates its response to SOF No. 6 denying the Mack companies were separate and independent.**

    c.   Mack Investments I LLC, which had several commercial projects under several associated series companies.  McClelland Tr. Vol. 1, Tr. 26:12-28:24.  Mack Investments I LLC maintained separate books and records in Quickbooks.  Trustee's Ex. 5, ¶ 10.

**RESPONSE:** **Defendant admits that Mack Investments I LLC relates to a commercial real estate, but Ex. A to Trustee's Ex. 5 fails to specify the purpose was for the development of commercial property. Defendant admits that Trustee's Ex. 5, ¶ 10, the document states there was a separate QuickBooks file but denies whether Mack Investments I LLC monies or funds in this file were segregated and not comingled with other Mack Entities. Advanced Ex. B, ¶¶ 11, 17-19). Defendant also incorporates its response to SOF No. 6 denying the Mack companies were separate and independent.**

    d.   Mack Investments I LLC, Series 1365-67 River Rd., which operated a multi-unit residential building. Trustee's Ex. 2, 39:13-19.

**RESPONSE:** **Defendant admits that James H. McClelland testified that 1365-67 River Rd. was a single building, bulti-unit residential building. Defendant also incorporates its response to SOF No. 6 denying the Mack companies were separate and independent.**

    e.   Mack Investments II LLC, which, like Mack Investments I LLC, ran several commercial projects through several associated series companies.  Trustee's Ex. 2, 39:20-40:4.  Mack Investments II LLC maintained separate books and records in Quickbooks.  Trustee's Ex. 5, ¶ 10.

**RESPONSE:** **Defendant denies the statement because Jim Jr. does not testify that Mack Investments II, LLC "ran several commercial projects through associated series companies" in the cited transcript. Defendant admits that Trustee's Ex. 5, ¶ 10, the document states there was a separate QuickBooks file but denies whether Mack Investments II LLC monies or funds in this file were segregated and not comingled with other Mack Entities. Advanced Ex. B, ¶¶ 11, 17-19). Defendant also incorporates its response to SOF No. 6 denying the Mack companies were separate and independent.**

    f.   Mack Investments II LLC, Series 6787 159th Street LLC, which operated an office building.  Trustee's Ex. 2, 41:6-15.

**RESPONSE:** **Defendant denies the statement because the term "operated" is not defined and is not supported by the exhibit cited. Defendant also incorporates its response to SOF No. 6 denying the Mack companies were separate and independent.**

g.  Mack Investments II LLC, Series 6800 Centennial, which operated an office

building out of which Oak Park Avenue Realty Ltd. operated.  Trustee's Ex. 2,

34:14-35:5, 42:15-43:2.

**RESPONSE:  Defendant denies the statement because the term "operated" is not defined
and is not supported by the exhibit cited. Defendant admits that Oak Park
Avenue Realty Ltd. was located at the 6800 Centennial building. Defendant
also incorporates its response to SOF No. 6 denying the Mack companies were
separate and independent.**

h.  Mack Investments II LLC, Series 6820 centennial Drive, which operated an

office building out of which Mack Industries Ltd. and the McClellands other

companies operated. Trustee's Ex. 2, 35:6-10, 40:21-41:1.

**RESPONSE:  Defendant denies the statement because of the term "operated" is not defined
and not supported by the exhibit cited. Defendant admits only that MIL was
located at 6820 Centennial Drive, and "all the affiliated companies." Trustee's
Ex. 2 35:7-10. Defendant objects to the inaccurate description of "McClellands
other companies" because the deposition testimony does not support statement
7(h). *Id.*  Defendant also incorporates its response to SOF No. 6 denying the
Mack companies were separate and independent.**

i.  Mack LOC I LLC, which owned, rented, and sold single-family homes.

Trustee's Ex. 2, 43:7-44:2.  Mack LOC I LLC was owned by Mack LOC

III LLC, which was owned by James K. McClelland.  Trustee's Ex. 5, ex.

A.

**RESPONSE:  Defendant admits that Mack Loc I LLC owned rented and sold single family
homes.  Defendants denies the ownership of Mack Loc I LLC and Series III,as
stated in the statement above, but admits that Mack Loc III owned a
membership interest in Mock Loc I and James McClelland owned a
membership interest in Mack Loc III. Defendant also incorporates its response
to SOF No. 6 denying the Mack companies were separate and independent.**

6

j.   Mack LOC II LLC, which owned, rented, and sold single-family homes.

McClelland Tr. Vol. 1, 43:7-44:2.

**RESPONSE: Defendant admits the statement but also incorporates its response to SOF No. 6 denying the Mack companies were separate and independent.**

k.   Wheelhouse Investments LLC, which is a small "fix and flip: company owned

and operated by James H. McClelland Trustee's Ex. 2, 45:3-22.  Wheelhouse

maintained separate books and records in Quickbooks.  Trustee's Ex. 5, ¶ 10.

McClelland continues to operate Wheelhouse.  Trustee's Ex. 2, 45:7-9.

**RESPONSE: Defendant admits Wheelhouse Investments LLC is a small fix and flip company and admits that Jim Jr. through MIL, is in charge of all operations, business, construction and financial.   Advanced Ex. B,  ¶¶ 11, 12,  13. Defendant denies the ownership, as stated by the Trustee.**

**2.   The relationship between Mack Industries Ltd. and American Residential.**

8.   In December 2012, Mack Industries Ltd. entered into a master lease agreement with

American Residential Leasing Company.  Advanced's Statement of Facts (ECF No. 112-2) ¶ 16.

Under this agreement, Mack Industries Ltd. agreed to lease back and manage investments

properties that American Residential had purchased from McClelland companies.  Trustee's Ex.

2, 115:16-116:1.

**RESPONSE: Defendant admits the ARL lease. To the extent the allegations of this paragraph refer to a written document, Defendant  admits only the contents of the written document and denies the allegations to the extent they conflict with the written documents.**

9.   Although  the  parties  never  came  to  a  formal  agreement  on  the  issue,  the

McClellands believed that American Residential had committed to buying another 2000 or more

properties over five years, and that these would become part of the master lease as well. Trustee's Ex. 2, 108:14-110:3, 111:8-113:3.

**RESPONSE:** **Defendant denies the statement. Defendant admits that American Residential ("ARL") and MIL agreed that ARL would purchase 2500 properties over 5 years. Trustee's Ex. 2, 112: 6-10; Advanced Ex. B, ¶ 32.**

10.     The McClellands viewed the master lease agreement as a "loss leader" for American Residential's future purchases of real estate. Trustee's Ex. 2, 123:9-14.

**RESPONSE:** **Defendant admits the statement.**

11.     The McClellands knew by December 2013 that American residential was "going away" and would stop buying properties. McClelland Dep. vol. 2 (Trustee's Ex. 3) 38:16-39:2, Nov. 18, 2021. In February 2014, American Residential stopped buying properties. Trustee's Ex. 2, 119:23-120:3. The McClellands' companies no longer received the proceeds from sales to American Residential, but Mack Industries Ltd. was left with the liabilities under the master lease agreement. Trustee's ex. 2, 123:11-14.

**RESPONSE:** **Defendant denies that McClellands knew by December 2013, that ARL was "going away and would stop buying properties". Defendant admits that McClellands had an inclination that they [ARL] were changing. In January, they [ARL] bought more properties and in February 2014, ARL stopped. Trustee's Ex. 3, 38:24-25; 39:1. Defendant admits the last sentence of statement no. 11.**

12.     In January 2014, Christopher Jay Byce joined American Residential as its Senior Vice President of Investments. Byce Dep. (Trustee's Ex. 17) 12:13-18, Dec. 20, 2021. Among other things, Byce was responsible for American Residential's relationship with Mack Industries Ltd. *Id.* 17:9-18:14.

**RESPONSE:** **Defendant admits the statement.**

13.     Eric Workman was Byce's main contact at Mack Industries Ltd. *Id.* 19:5-7.
Workman was the Vice President of Sales and Marketing of Mack Industries Ltd. Workman Dep.
(Trustee's Ex. 19) 12:22-23, Dec. 20, 2021.  Workman was the primary person who dealt with
American Residential, and the primary conduit for negotiations when the relationship broke down.
*Id.* 17:14-16, 22:14-23:4.  James K. McClelland and James H. McClelland supervised Workman.
*Id.* 14:5-19.   Workman did not negotiate independently: he negotiated at the McClellands'
direction and would not have communicated anything to American Residential without their
authority.  *Id.* 23:5-19.

**RESPONSE:** **Defendant admits the statement except that Defendant denies that the
McClelland's supervised him. Rather Workman testified he reported to the
McClellands. (Trustee's Ex. 19, 14:5-19**).

14.     Although there was no agreement to buy more houses, Eric Workman told Byce
that Mack Industries ltd. would stop paying under the master lease agreement if American
Residential stopped buying properties.  Trustee's Ex. 17, 22:17-23:3.

**RESPONSE:** **Defendant objects to the statement there was no agreement to buy more houses
and admits the remaining portion of the statement. Trustee's Ex. 2, 112: 6-10;
Advanced Ex. B, ¶ 32.**

15.     In an email dated February 19, 2014, James H. McClelland sought advice on the
situation from the company's lawyer, James Pittacora.  Email (Trustee's Ex. 10).  McClelland
stated that the "[****] heads at ARP absolutely f[***]ed us on this deal" and discussed options for
getting out of the deal.  *Id.* In doing so, McClelland noted: "The beauty is that we are not even
signed on the contract personally and there is no personal guarantee on this at all. … I could just
stop performing and let the chips fall as they may but I obviously want to discuss this with you in
detail as to our game plan can go in several different directions. *Id.*

**RESPONSE:** **Defendant denies the statement because of the Trustee's mischaracterization
of the email and failure to quote the entire email accurately. The Trustee fails
to set forth the entire contents of the mail. Instead, the Trustee inappropriately
copied and pasted sentences out of context. As a result, this statement should
be stricken.  Trustee's Ex. 10.**

16.     In April 2014, Byce visited Mack Industries Ltd., and James K. McClelland took

Byce on a tour of several properties.  Trustee's Ex. 17, 23:21-24:11, 27:9-21.  The properties that

McClelland selected were in order.  *Id.* But after that meeting, Byce visited on his own several

other properties that were tear-downs or completely abandoned lots.  *Id.* 24:15-22.  From this,

Byce knew that Mack Industries, Ltd. was misrepresenting what the portfolio looked like.  *Id.*

24:23-25:1.

**RESPONSE:** **Defendant admits the statement except the last sentence, i.e.Trustee's
mischaracterization that MIL was "misrepresenting" what the portfolio look
like.  Byce does not use that word and as such the Trustee's last sentence is
denied.  Trustee's Ex. 17, 24: 23-24; 25:1.**

17.     James K. McClelland also introduced Byce to former mayors during the tour.  *Id.*

24:8-9.  At one point, James K. McClelland said, "Look. The-the mayor-the last five mayors of

Chicago-the last five mayors of Chicago have all ended up in prison for a reason.  It's just the way

things work around here." *Id.* 25:12-16. McClelland made it clear that this is how things got done,

and failure to have these connections would mean you would not get things. Done. *Id.* 25:18-22.

At best, you would have significantly increased costs; at worst, you would have an asset that did

not produce income at all. *Id.* 25:22-26:1. James K. McClelland would know what it took: in a

federal case in the Northern District of Oklahoma, he went to jail for defrauding some people.

Trustee's Ex. 2, 154:8-155:3.

**RESPONSE:** **The statement regarding James K. McClelland going to jail should be stricken
because it violates Fed. R. Evid. 609(a)(1). Any conviction of fraud more than
10 years old is not admissible evidence.  Fed. R. Evid. 609(a)(1). The case was**

**closed on February 13, 1997. See 4:95-cr-00102. The Trustee knows that this evidence is not admissible yet seeks to prejudice the court by offering it. The Trustee's conduct should not be tolerated.**

**This statement of facts should be stricken because No. 17 violates local rule 12 (b)(3)(c) (a concise statement of short, numbered paragraphs with additional facts). Statement no. 17 contains five (5) different statements of fact.**

**This statement should also be stricken because Byce's testimony is hearsay evidence. The testimony sets forth alleged statements made by James K. McClelland out of court and are offered for the truth of the matter asserted, thus constitute hearsay.**

**If the court does not strike No. 17, Defendant admits that the Trustee accurately quoted Byce's deposition testimony.**
**However, Defendant denies that James K. McClelland made these statements.**

18.    After the tour, Byce sent a follow-up email to Workman requesting additional basic financial information about Mack Industries Ltd. and the American Residential portfolio. Emails (Trustee's Ex. 20). In discussing Byce's request, James H. McClelland said, "[T]hey can go f[***] themselves. … I know full well they have the 'right' to ask for it because out contract says so. I don't care. As long as we are actually performing under the contract they can go scratch. Unless it was small pieces of info easily had that would placate them I say no." *Id.*

**RESPONSE:** **Defendant denies the statement because the Trustee does not cite the full context of all the emails in the chain. Instead, the Trustee improperly cuts and pastes portions of the emails, thus taking the statements out of context to infer false impressions.**

**Further, the email pertains to what documents MIL is required to provide ARL and has no relevancy to the Advanced litigation. (Ex. G, Byce Aff. ¶¶ 19-20).**

19.    Mack Industries Ltd. largely never provided the information Byce requested. Trustee's Ex. 17, 29:18-12.

**RESPONSE:** **Defendant denies the statement. See, Trustee's Ex. 17, 29:18-12.**

20.     In July 2014, Workman sent Byce an email asking to modify the master lease agreement. *Id.* 30:24-32:2; Emails (Trustee's Ex. 22).

**RESPONSE:  Defendant admits the statement.**

21.     In connection with that request, Byce had several phone conversations with Workman. Trustee's Ex. 17, 32:3-13. Byce explained to Workman that the triple-net lease should stand on its own and should not need to be supported by additional property sales, so Mack Industries Ltd.'s demands were a big red flag. *Id.* 32:17-33:15. Byce and Workman then had the following conversation:

> *Workman*: Well, you know, we're just going to ride this thing out, and there's not going to be anything for you to chase.
>
> *Byce*: Well, look.  I understand how to do this, and, you know, we will-we will pursue collections as far as we possibly can, including, you know, forcing bankruptcy.
>
> *Workman*: Well, you know, the McClellands are smart, and they will-you know, they'll make sure you don't have anything that you can get your hands on. Whether its personal or-or corporate, you know, we know this lease is structured, and we'll make sure all of those entities, you know, have no assets for your to be able to touch.
>
> *Byce*: Well, I know what fraudulent transfers are, and that's what you're taking about. And that's-and we'll-we will be taking those measures. Absolutely.

*Id.* 33:16-34:9.

**RESPONSE:  Defendant moves to strike the last statement made by Byce regarding his opinion as to what constitutes "fraudulent transfers." This is a legal conclusion**

**and Byce is not a lawyer and has no basis for rendering this conclusion. See objections made by Advanced's counsel at Byce deposition: Trustee's Ex. 17, 47:11-24; 48:1-23.**

**Defendant admits only that Trustee copied the transcript from Byce's deposition but denies that Workman made those statements. See Workman's Affidavit and Deposition Trustees Ex. 19; Advanced Ex. F.**

22.    In December 2014, American Residential sent a notice of default to Mack Industries Ltd. Notice (Trustee's Ex. 19). Byce sent the notice because his impression was that Mack Industries Ltd. was doing exactly what Workman said it would do: drag it along and bleed it until it had no assets. Trustee's Ex. 17, 37:17-38:4.

**RESPONSE: Defendant admits only that the Trustee copied the testimony from Byce's deposition but denies the accuracy of Byce's "impressions" regarding MIL.**

23.    In fact, Mack Industries Ltd. was insolvent by that point. From January 31, 2014, until its bankruptcy filing, Mack Industries Ltd. was balance sheet insolvent. Kim Report (Trustee's Ex. 23).

**RESPONSE: Defendant admits the Kim Report makes this statement, however, denies the accuracy since Defendant reserved the right to contest insolvency at trial, if the summary judgment motion was denied. See, Advanced's memorandum in support of summary judgment.**

24.    In March 2016, American Residential sued Mack Industries Ltd. and others. Advanced's Statement ¶ 75.

**RESPONSE: Defendant admits the statement.**

25.    By September 2014, Mack Industries Ltd. stopped making the full rental payments, and it made no payments at all in eight months between September 2014 and February 2016. American Residential calculates that Mack Industries Ltd. owes more than $4.7 million for unpaid

rent. Attachment to Proof of Claim (without its own exhibits A and B, Trustee's Ex. 24), ¶¶ 10-12.

**RESPONSE: Defendant admits ARL filed a proof of claim but lacks sufficient knowledge to admit or deny the accuracy or truth of the proof of claim. Defendant does not have access to ARL's books and records and cannot respond.**

26.    In 2014, Mack Industries Ltd. stopped paying property taxes on American Residential's properties for the years 2013 and forward. American Residential calculates that Mack Industries Ltd. owes more than $6.5 million for these taxes. *ID.* ¶¶13-14.

**RESPONSE: Defendant lacks sufficient knowledge to admit or deny the accuracy or truth of the statement. Defendant does not have access to ARL's books and records and cannot respond.**

## 2.1   The Workman affidavit

27.    In an affidavit submitted in connection with American Residential's suit against Mack Industries Ltd., Workman states that he never made any threats to Byce that Mack Industries would fraudulently transfer assets.  Advanced Ex. H ¶ 10.  Workman, however, describes an in-person meeting with Byce. *Id.* ¶¶ 5-11.

**RESPONSE: Defendant admits the statement.**

28.    Byce met with Workman in person once, in April 2014.  Trustee's Ex. 17, 38:21-39:9.  Workman did not make the dissipation threat at that meeting. *Id.* 40:23-41:3. Instead, Workman made the threat on a later phone call, as discussed above. *Id.* 41:2-3.

**RESPONSE: Defendant denies that Workman made the dissipation threat because Workman denies ever making any such statements. Advanced Ex. H, ¶ 10. Defendant admits Workman and Byce met in or around April 2014.**

29.     Workman's affidavit is dated February 6, 2017.  Advanced Ex. H. Workman left Mack Industries Ltd. in July 2014. Trustee's Ex. 19, 14:20-15:2. Several months after he left, there was a dispute between Workman and the McClellands over commissions Workman claimed he was owed.  Emails (Trustee's Ex. 25), Feb. 4, 2015; Trustee's Ex. 3, 44:13-47:12. James H. McClelland argued that they should not push the dispute because "we have Mansury" – a trial in another dispute – "coming up we need him to testify and ARP as well." Trustee's Ex. 25. It "ended up working out that way, meaning we [the McClellands] did what we said we were going to do: and Workman did his best to help the company during his transition, including testifying on the company's behalf. Trustee's Ex. 3, 46:14-47:19.

**RESPONSE:  Defendant admits Ex. H is dated February 6, 2017 and Workman testified he left MIL in July 2014.  Defendant disputes the Trustee's characterization of Workman wanting to receive commissions earned after he left MIL as a "dispute."**

**Defendant denies the last sentence of statement no. 29 because the Trustee inaccurately characterizes the testimony.  Trustee's inference that MIL paid Workman in exchange for favorable testimony is not supported by the McClelland transcript and should be stricken.**

**An accurate reading of the transcript shows that Workman left MIL on good terms, Workman continued to help MIL during his exit transition. Trustee Ex. 3, 46:14-47:19.  Since the Mansury matter involved a contract dispute and Workman was the person who made the sale to Mansury, he needed to testify in the case.  *Id.*, 47:13-18.**

**Defendant admits Ex. H is dated February 6, 2017, and Workman testified he left MIL in July 2014.  Defendant disputes the Trustee's characterization of Workman wanting to receive commissions earned after he left MIL as a "dispute."**

## 2.2    The new Byce affidavit

30.     On December 3, 2021, Byce executed an affidavit. Advanced Ex. G.

**RESPONSE:  Defendant admits the statement.**

15

31.    Byce submitted this affidavit in response to a subpoena issued to him (without notice to the Trustee) by Pamela Leichtling, Advanced's lawyer. Trustee's Ex. 17, 42:14-19. Leichtling and another attorney, Brian Jackiw, offered not to deposes Byce submitted an affidavit. *Id.* 43:5-21.

**RESPONSE:**  **Defendant admits that after consultation with Byce and attorney Jackiw, Byce agreed to sign an affidavit in lieu of sitting for another deposition. Byce agreed to sign an affidavit which included  his previous testimony in another *In re Mack* adversary proceeding, *Peterson v. Capital One N.A.,* docket no. 19 A-00372 where attorney Matthew O. Stromquist deposed him. Defendant denies the Trustee did not have notice of the subpoena deposition.**

32.    he affidavit, Byce says he has "no direct knowledge" of various facts. Advanced Ex. G But just because Byce did not have direct knowledge of something, that does not mean that did not happen.   Trustee's Ex. 17, 45:19-21. Byce never had a chance to investigate Mack Industries Ltd.'s threat to dissipate assets.  *Id.* 45:22-24.  In fact, Byce had requested financial information from Mack Industries Ltd., but Mack Industries Ltd. never turned it over. *Id.* 46:1-5. It is difficult to detect fraudulent transfers.  *Id.* 46:6-7.

**RESPONSE:**  **Defendant admits that Byce testified that he had no knowledge that MIL was paying vendors, contractors, or other third parties with an intent to delay payment to ARL or defraud ARL.  Advanced Ex. G, ¶¶ 13-14.**

**Defendant moves to strike the statement regarding Bryce's lack of knowledge didn't mean it did not happen because Byce explains that ARL expected the contractors to be paid.  Trustee Ex. 17, 46:11-23.**

**Byce admitted that he expected the contractors would be paid for work and they should have gotten paid.  Id. 46:18-24; 47:1-9.**

**Byce testified: "the contractors should've gotten paid and that should've been part of Mack's responsibilities. So paying of contractors or credit cards would not mean they were defrauding American Residential, per se." *Id*.**

16

33.     In his affidavit, Byce says that he "never stated that Mack would pay its vendors, contractors, or other third parties, just so American Residential Properties would not get paid." Advanced Ex. G, ¶ 17. But just because Byce never said that, does not mean it did not happen. Trustee's Ex. 17, 46:11-18. Byce expected that Mack Industries Ltd. would pay vendors and the like for work they did on American Residential properties or for Mack Industries Ltd. itself. Trustee's Ex. 17, 46:18-47:10. But Byce knew that Mack Industries Ltd. "should have only been paying on properties that were owned by that entity. So if Mack [Industries Ltd.] was diverting payments from that entity for assets that were owned by another entity, in my opinion, that would be a fraudulent [transfer]." Trustee's Ex. 17, 48:10-49:9.

**RESPONSE:**     **Defendant admits that Byce testified that he had no knowledge that MIL was paying vendors, contractors, or other third parties with an intent to delay payment to ARL or defraud ARL. Advanced Ex. G, ¶¶ 13-14.**

**Defendant moves to strike the statement regarding Byce's lack of knowledge didn't mean it did not happen because Byce explains that ARL expected the contractors to be paid. Trustee Ex. 17, 46:11-23.**

**Byce admitted that he expected the contractors would be paid for work and they should have gotten paid. *Id.* 46:18-24; 47:1-9.**

**Byce testified: "the contractors should've gotten paid and that should've been part of Mack's responsibilities. So paying of contractors or credit cards would not mean they were defrauding American Residential, per se." *Id.***

**Defendant moves to strike the last sentence of the statement regarding Byce's opinion as to whether alleged diversion of assets to another company constitutes fraud. What constitutes "fraud" is a legal opinion and Byce is not an attorney to make this opinion. Further, the opinion is pure speculation. If not stricken, Defendant denies the statement.**

**Advanced's counsel and attorney Jackiw objected to this line of questioning at the deposition as well. *Id.* at 48:10-49:14.**

**Further, Byce admitted he had no facts upon which to render an opinion as to fraudulent transfers. *Id.* at 49: 3-5.**

34.    in his affidavit, Byce says that, based in my conversations with the McClellands and Eric Workman, my only expectation was that the McClellands intended to move Mack's assets-namely real property-to other Mack and Mack controlled companies that would make discovery of assets more difficult for American Residential Properties." Advanced Ex. G, ¶ 26. But it is unusual for someone to tell you in detail how they are going to hide assets. Trustee's Ex. 17, 49:24-50:4. And even if someone does so, that does not mean they cannot hide assets in other ways. *Id.* 50:5-8. It is possible for someone to defraud you in a different way than they told you they were going to defraud you. *Id.* 50:23-51:7.

**RESPONSE:** **Defendant admits that Byce testified that his only expectation was that the McClellands intended to move Mack assets to other Mack controlled companies. Advanced Ex. G, ¶ 26.**

**Defendant moves to strike the remainder of statement No. 2 on the basis that Byce is not competent to testify on what conduct constitutes "fraud" and his opinion is pure speculation. Advanced moved to strike this whole line of questioning during the deposition.  Trustee's Ex. 17: 49:24-50:8, 23-51:7. If not stricken, Defendant denies because it is a  legal conclusion.**

**3.    Mack Industries Ltd. dissipates its assets by paying Advanced Home Remodeling Inc. to develop properties that other McClelland companies owned.**

35.    Advanced Home Remodeling Inc., owned by Michael Marion, was a general contractor that rehabbed homes for its customers. Marion Dep. vol. 1 (Trustee's Ex. 13), 22:14-23:2, Dec. 13, 2021.

**RESPONSE:** **Defendant states that Marion was a shareholder in Advanced and admits the remainder of the statement.**

36.    In 2014, about 80% of Advanced Home Remodeling Inc.'s business was with Mack Industries Ltd., and that peaked at 90% to 95% in later years. *Id.* 19:9-20:2.

**RESPONSE:** **Defendant admits the statement and further states that when Advanced stopped working with MIL in 2016, Advanced's business with MIL decreased.** *Id.* **20:19-23.**

37.     After a parcel of real estate was acquired, the McClellands' construction department would do a primary walkthrough for scope of work, then assign the property to a general contractor. Trustee's Ex. 2, 84:1-12.

**RESPONSE:** **Defendant denies that "McClellands' construction department performed a primary walkthrough. Rather, Jim Jr. testified that after MIL buys a property, it gets turned over to its [MIL] construction department.  Trustee's Ex. 2, 84:1-12. Defendant admits the remainder of statement no. 37.**

38.     The McClellands used several general contractors, but Advanced Home Remodeling Inc. was the one that did the most by volume.  McClelland Dep. (Trustee's Ex. 1)(, 12:17-13:8, Feb. 1, 2022.

**RESPONSE:** **Defendant admits the statement.**

39.     The owner of Advanced Home Remodeling Inc., Michael Marion, had a close relationship with James H. McClelland. The two met playing basketball together at the gym. Marion Dep. vol. 2 (Trustee's Ex. 14), 20:6-16.  The two were so close that McClelland even designated one game as a "celebration of our friendship." (Email (Trustee's Ex. 12).

**RESPONSE:** **Defendant denies the statement: Marion and Jim Jr. were not close friends. Marion met Jim Jr. in a pickup basketball game at Lifetime Fitness and there were 25 guys that played regularly for a couple of years.  Trustee's Ex. 1, 15:7-17.  Marion testified that they were not social friends.  Advanced Ex. A, ¶¶ 5-6; Advanced Ex. B, ¶ 75.**

**Defendant objects to the inaccurate description of Trustee's Ex. 12 and denies that there was a "celebration of our friendship" as it pertained to Marion and Jim Jr.  Ex. 12 expressly states that an old basketball friend, Morley, was coming back to town, for another basketball friend's funeral and Jim Jr. was organizing a basketball game for the guys who played with "Morley" and**

> **wanted the basketball game to be a celebration of the guys' friendship. Trustee's Ex. 12.  See Jim Jr.'s deposition testimony, Trustee Ex. 1, 16:3-18.**

40.     McClelland and Marion were close enough that, at times, they discussed the financial issues that Mack Industries Ltd. faced. In February 2017, the two exchanged emails in which McClelland stated;

> We should get together this week to discuss our plan moving forward As you are aware I have advanced large sums of money to you and *that has put me and my business in harms way*. We do have business moving forward as I have discussed with you but as *I reorganize I am getting pressure from the banks to resolve this issue.* At a minimum for now I need your guys to finish the houses on this list asap. I need your guys there every days and even Saturday's if possible. Not closing homes under my current model will kill my plan.  I can give you more houses right away but that makes little sense of you do not have the manpower to work on them.  We can of course review the individual advances and loans but regardless of the final amounts we agree on it is certainly upside down substantially.  *We need to plan for this so I can avoid being pushed to collection by my own creditors.* Let's meet this week to discuss.

Email (Trustee's Ex. 16) (emphasis supplied)

**RESPONSE:** **Defendant denies the statement and that Marion and Jim Jr. discussed MIL's financial situation.  Jim Jr. testified that MIL or Mack Companies financial condition was never discussed with Advanced. See, Advanced Ex. B, 86-87. Marion testified that Jim Jr. never discussed MIL or Mack Companies financial situation with him and he had no knowledge of MIL's financial situation or the ARL Litigation. Advanced Ex. A, ¶¶ 31-33.**

**Further, Trustee's Ex. 16 does not discuss whether MIL is having financial issues.**

**Rather, Jim Jr. Marion testified in his deposition that Ex. 16 was Jim Jr.'s email response to Marion requesting more work from MIL and Jim Jr. telling him that Advanced has to finish the projects it already has. The houses needed to be finished, so MIL could sell the homes and make money.   MIL needs the money to satisfy obligations. See, Trustee Ex. 1, 38:23- 40:23.**
**This hardly states the financial condition, i.e., debt, cash on hand, profit/losses of MIL.**

41.    While working with the McClellands, Advanced performed work on a number of properties owned by the McClellands or their companies.  Advanced Ex. E. A summary of these transactions for the independent separate- or single-project entities, described in paragraphs 6 and 7 above, is as follows:

| Company/Individuals | Amount at Issue |
| --- | --- |
| 2300-16 S. Central, LLC | $300.00 |
| James K. and Ann McClelland | $1,525.00 |
| James H. McClelland | $166,772.71 |
| Mack Investments I LLC | $916,431.55 |

| | |
|---|---:|
| Mack Investments I LLC, Series 1365-67 River Road | $34,933.29 |
| Mack Investments II LLC | $175.00 |
| Mack Investments II LLC, Series 6787 159th Street LLC | $4,656.50 |
| Mack Investments II LLC, Series 6800 Centennial | $25,660.00 |
| Mack Investments II LLC, Series 6820 Centennial Drive | $36,853.25 |
| Mack LOC I LLC | $458,174.63 |
| Mack LOC II LLC | $49,943.48 |
| Wheelhouse Investments LLC | $323,002.82 |

*Total:*     *$2,018,428.23*

Advanced Ex. E.

**RESPONSE:** **Defendant admits Advanced performed work on properties, as directed by Jim Jr. through MIL contracting with Advanced. Advanced did not know who held legal title or the owner of any specified property because MIL did not disclose the information. Advanced Ex. A, ¶¶ 20-22; Jim Jr., ¶ 84(f).**

> **Advanced's Ex. E is a document created by the Trustee and allegedly is the Trustee's summary of Transfers, as revised. Defendant denies the authenticity or truth of the information contained therein. Defendant further denies the characterization of these companies as separate and independent, in light of Jim Jr.'s testimony that all the Mack entities, or related companies were treated as one big company under the Mack Companies. Advanced Ex. B, ¶¶ 11, 17, 19. Defendant incorporates it response to SOF No. 6 as though fully set forth herein.**

42.     Advanced admits that its work enhanced the value of the properties that it worked on. Trustee's Ex. 13, 50:15-18. By enhancing the market value, it allows the property to be sold on the open market, and the seller gets a better price for the property. *Id.* 50:19-51:2. Advanced admits that the value would go up for "whoever owned the property." *Id.* 51:3-10.

**RESPONSE:** **Advanced admits the statement.**

43.     By using Mack Industries Ltd.'s funds to pay Advanced Home Remodeling Inc. to perform construction work for the McClellands' other companies, the McClellands built of the value of the other companies at the expense of Mack Industries Ltd. and its creditors.

**RESPONSE:  Defendant denies the statement because it is not a statement of fact but rather a legal conclusion.**

In August 2015, when Mack Industries Ltd. had stopped paying American Residential as required, the McClellands wanted to increase their take-home pay to $20,000 per month each. Email (Trustee's Ex. 26).  James H. McClelland proposed that this amount could be paid in part "through our commercial side.  Since we have taken zero from this venture there is equity in projects that we can draw from and do it fairly quickly." *Id.* The "commercial side" referred to in the email is the special- or single-project entities referred to in paragraphs 6 and 7 above. Trustee's Ex. 3, 60:17-62:6. This equity was built up in the other entities because Mack Industries Ltd. paid contractors like Advanced to do so.

**RESPONSE:  Defendant denies that all payments had been stopped, as Trustee offers no evidence in support of this fact.  Defendant admits only the contents of the written document and denies the Trustee's characterization to the extent they conflict with the written document.**

44.     Advanced was aware of its right to assert mechanics liens on real estate in the event it was not paid for its work, and it had threatened to place liens in the past.  Trustee's Ex. 14, 92:13-93:14. Advanced understood that this would prevent an owner from, for instance, refinancing the property. *Id.*

**RESPONSE:  Defendant admits it is aware of its rights under the Mechanic's Lien Act and that the mechanic's lien comes into play only when Advanced had  not been paid on a contract or job. Defendant has threatened clients in the past to record a lien as a result of nonpayment.**

**Advanced further states that Advanced had no reason to record a lien on any project done for MIL because MIL paid.**

**Advanced further admits that it has never had to record a lien and has never been involved in a project where a lien was recorded.  Trustee's Ex. 14, 93:2-14.**

45.    Despite this, Advanced claims that it was never aware of the owner of the property it worked on, and that it assumed the person paying was the owner.  Trustee's Ex. 13, 40:23-41:2. Despite having the address of the property, Advanced apparently did no investigation at all, instead assuming the person paying him was the owner. *Id.*

**RESPONSE:** Defendant denies the statement.  The Trustee's statement is not a fact but an argument and should be stricken.  The existence of the mechanic's lien act does not impute knowledge to Advanced of who owned the properties where Advanced performed work. The Trustee fails to set forth any facts linking these two disjointed thoughts.

The Trustee set forth no legal duty for Advanced to have conducted any investigation into who owned the properties. This is especially true where the parties had been doing business for many years and the course of dealings was MIL hired Advanced and directed where the work would be performed.

Further, an address listed on a contract which expressly states that MIL or Mack Companies is the client fails to provide any notice to Advanced of ownership of the property site. Advanced Ex. A, ¶¶ 14, 16, 20-21;  Exs. A, Group Exs. A-1- A4; B and Ex. A-1 attached thereto.

Statement No. 45 contradicts the testimony of Marion, Jim Jr. and the contracts and invoices attached to the motion as Exs. A, Group Exs. A-1- A4; B and Ex. A-1 attached thereto.

Both Jim Jr. and Advanced testified that MIL did not disclose the owner of the properties where Advanced did work.  Advanced Ex. A, ¶¶ 14, 16, 20-21 and  Group Exs. A-1- A4; Advanced Ex. B, ¶¶ 71, 84(A) exhibit A-1 attached, ¶ 84 (D)-(F).

> **Advanced was not required to submit lien waivers or obtain any permits per the contracts with MIL. MIL pulled all permits per contract. Advanced Ex. A, ¶¶ 18-19. Advanced Ex. B, ¶ 84 (E), (H).**
>
> **Jim Jr. and Marion testified that "MIL" or Mack Companies was listed as the client on the construction contracts. Advanced Ex. A, ¶¶ 14, 16.**

46.    Advanced knew, when it was performing the work, that it was performing work on properties owned by James H. McClelland's brother and sister.  Trustee's Ex. 14, 98:7-100:20.

**RESPONSE:** **Defendant denies that it knew the owner of the properties. Defendant admits it performed a small tile repair for Jim McClelland's brother and "a little bit of floor work" at the house where Jim Jr.'s sister lived.  (Marion dep. Trustee's Ex. 14, 98:7-12; 99:12-22; 100:18-23; 101:1-24; 102:1-7).**

47.    James K. McClelland and James H. McClelland were in the habit of deleting emails so others would not see what they wrote to each other.  Emails 9trustee's Ex. 27, Feb. 27, 2015.

**RESPONSE:** **Defendant denies that Ex. 27 supports the statement that the McClelland's were in the "habit" of deleting emails and this statement should be stricken. This was a private conversation between the Jim Sr. and his son, Jim Jr.  and Trustee fails to show a company scheme to "delete'" emails.**

48.    The McClellands knew that putting special projects in separate companies or in their own names would protect them, and they often did this.  Emails (Trustee's Ex. 28), Oct. 15, 2015.

**RESPONSE:** **Defendant denies that Ex. 28 supports this legal conclusion by the Trustee and it should be stricken.**

49.    The McClellands regularly used Mack Industries Ltd. employees to do work on their personal projects, even though they knew they should not do so. Emails (Trustee's Ex. 29), Oct. 16, 2015.

**RESPONSE:** **Defendant denies the Trustee's implication that using MIL employees was improper. Rather, Ex. 29 expressly discusses not using MIL employees**

because they are needed to do company business and that is where their time
should be spent. Defendant admits only the contents of the written document
and denies the Trustee's characterization to the extent they conflict with the
written document.

50.     Even after American Residential sued Mack Industries Ltd., the McClellands' focus

was *still* on how to extract even more money from the company, and they continued to take money

out of the company for their personal needs.  Emails (Trustee's Ex. 30), Mar. 23, 2016; Emails

(Trustee's Ex. 31), May 5, 2016.

**RESPONSE:** **This statement should be stricken because it is a legal conclusion.  Defendant
denies the statement because the Trustee's characterization is inaccurate as
compared to the contents of the exhibits. Defendant admits only the contents
of the written document and denies the Trustee's characterization to the extent
they conflict with the written document.**

51.     The McClellands created false financial information. They created "lose" books to

show losses and "good" books, and they decided which assets to show on each set of books.  Email

(Trustee's Ex. 32), Dec. 25, 2016; Email (Trustee's Ex. 33), Dec. 27, 2016.

**RESPONSE:** **Defendant denies the statement because the statement is a legal conclusion and
should be stricken. Defendant admits only the contents of the written
document and denies the Trustee's characterization to the extent they conflict
with the written document.**

Respectfully submitted,

Advanced Home Remodeling Inc.

/s/     Pamela J. Leichtling
One of its Attorneys

Pamela J. Leichtling #6183213
Jill A. Sidorowicz # 6299380
Noonan & Lieberman, Ltd.
33 N. LaSalle Street, Suite 1150
Chicago, IL 60602
312-431-1455
pleichtling@noonanandlieberman.com
jsidorowicz@noonanandlieberman.com

26